# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| WELLS ENTERPRISES, INC., | |
| Plaintiff, | No. C11-4109-DEO |
| vs. | **ORDER** |
| OLYMPIC ICE CREAM, d/b/a MARINO ITALIAN ICES, | |
| Defendant. | |

This matter is before the court on two motions: (1) defendant's September 12, 2012, motion (Doc. No. 28) to stay this case in favor of arbitration and (2) plaintiff's September 26, 2012, motion (Doc. No. 30) to stay the arbitration proceedings filed by defendant. The court conducted a telephonic hearing on both motions on October 10, 2012. Plaintiff appeared through attorney Christine Lebron-Dykeman and defendant appeared through attorneys Douglas Fulton and Richard Schurin. Both motions are fully submitted.

## BACKGROUND

### A. *Procedural History*

On December 16, 2011, plaintiff Wells Enterprises, Inc. ("Wells") filed a complaint (Doc. No. 2) against Olympic Ice Cream ("Olympic").[1] Wells alleges trademark infringement in violation of 15 U.S.C. § 1114, false designation of origin in violation of 15 U.S.C. § 1125(a), common law trademark infringement and unfair competition. In general, Wells alleges that the name and trade dress utilized by

---

[1] Wells sued Olympic as "Olympic Ice Cream" but Olympic states that its legal name is "Olympic Ice Cream, Inc." *See* Doc. No. 2 at 1 and Doc. No. 28-1 at 1.

Olympic with regard to its "FROZEN FRUIT" bar improperly infringes on Wells' established rights concerning its "FROZFRUIT" bar.

Olympic responded to Wells' complaint by filing a motion to dismiss (Doc. No. 7) for lack of personal jurisdiction and improper venue. The Honorable Donald E. O'Brien denied the motion by order (Doc. No. 16) filed June 29, 2012. On September 5, 2012, Olympic and a sister company, Marina Ice Cream Corp. ("Marina") commenced an arbitration proceeding against Wells. One week later, Olympic filed its present motion to stay this case in favor of arbitration. Wells resisted that motion and filed its separate motion seeking a stay of the arbitration.

### B. *The Prior Business Relationship*

Wells is a corporation organized under Iowa law with its principal place of business in Iowa. Olympic is a New York corporation with its principal place of business in New York. Olympic alleges that it and Marina are "closely related entities" because "Frank Barone and Michael Barone have ownership interests in both companies."

On August 18, 2004, Wells purchased two New York corporations, Fruit-Ices Corp. (hereinafter "Fruit-Ice") and Chill Ices, Ltd. (hereinafter "Chill Ice"), from Michael Barone, Frank Barone, and David Edelstein. The Purchase Agreement provided Wells "'right, title and interest' in and to various trademarks, including" a trademark to the FROZFRUIT product. On January 1, 2005, Wells entered into a two-year distributorship agreement with Marina (the "2005 Agreement"). The agreement was signed by Michael Barone as Marina's Vice President. Frank Barone acts as Marina's President and Human Resources Manager.

The 2005 Agreement provided that Marina would distribute Wells' products, including FROZFRUIT. The agreement contained Marina's acknowledgement that

2

Wells owned "'all right, title and interest in and to the Wells' Trademarks, know-how and all other proprietary information . . .'" and, upon termination of the agreement, Marina would discontinue use of "'Wells' Trademarks and Wells' Property. . . .'"

On January 1, 2008, Wells and Marina entered into another distributorship agreement (the "2008 Agreement") which also stated that Wells maintained ownership of its Trademarks. The second agreement provided that any goodwill created by Marina's distribution "'shall be deemed to have been made by and inure to the benefit of Wells,'" and, upon the "termination or expiration" of the agreement, Marina "shall immediately discontinue the use of the Wells' Trademarks and the Wells' Property . . . .'"

The 2008 Agreement expired by its own terms on December 31, 2010, at which time Marina stopped distributing Wells' products. Soon thereafter, Olympic began selling its FROZEN FRUIT bar, which Wells alleges has "nearly identical trade dress to that of Wells' FROZFRUIT bar." Olympic distributes its products, including the FROZEN FRUIT bar, through Marina.

### C. *Wells' Complaint*

In its complaint, Wells alleges that the court has personal jurisdiction over Olympic for various reasons, including a contention that "Frank and Michael Barone, owners of [Olympic] have entered into four agreements with Wells, an Iowa company, three of which relate directly to the trademark and trade dress at issue in this judicial district." Doc. 2 at ¶ 6. In its "General Allegations," Wells makes numerous references to the various, prior agreements between Wells and Marina, including quotations from the 2005 Agreement and the 2008 Agreement concerning Wells' intellectual property rights. *Id*. ¶¶ 14-21. Wells contends that Olympic's alleged infringement of its rights "is particularly offensive and willful" because of Frank

3

Barone's and Michael Barone's prior involvement with Wells in their roles as principals of Marina.  *Id*. ¶ 24.

In describing its specific causes of action against Olympic, however, Wells makes no reference to any of its prior agreements with Marina.  In Count I, which alleges infringement of Wells' registered "FROZFRUIT" mark, Wells makes no allegations concerning the agreements.  Instead, it simply alleges that Olympic's sale of the FROZEN FRUIT product infringes Wells' trademark.  *Id*. ¶¶ 28-33.

In Count II, Wells alleges that its FROZFRUIT trade dress is distinctive and widely-recognized and that Olympic's FROZEN FRUIT trade dress is deceptively similar and is likely to cause confusion.  Wells further alleges that Olympic's purpose in copying Wells' trade dress is to capitalize on the goodwill Wells has developed with regard to its own product.  *Id*. ¶¶ 36-40.  Wells makes no allegations in Count II concerning any prior agreements between Wells and Marina.

Count III effectively restates the factual allegations of Counts I and II, with Wells contending that Olympic's alleged conduct also gives rise to claims under Iowa common law. Again, Wells makes no reference in Count III to any prior agreements with Marina.

### D. *The Personal Jurisdiction Arguments*

In resisting Olympic's motion to dismiss for lack of personal jurisdiction, Wells relied heavily on the prior relationship between Wells and <u>Marina</u> to demonstrate that Olympic has had the requisite contacts with Iowa.   Wells pointed out that "[t]he owners of [Olympic], through their ownership of three other companies—Fruit-Ices Corp., Chill Ices, Ltd., and Marina Ice Cream—have entered into four separate agreements with Wells, an Iowa company, relating directly to the trademark at issue."  Doc. No. 9 at brief page 8.  Wells noted that since 2004, in connection with the two distribution agreements, Marina "sold 834,657 cases of the FROZFRUIT product totaling

4

$5,744,403 in sales on behalf of Wells." *Id.* Wells further contended that "on at least one occasion Michael Barone has traveled to Iowa to tour Wells' facility" and that "Michael Barone has been involved in telephone conference calls with Wells' employees approximately ten times over the years relating to the Distribution Agreements." *Id.* at 8-9.

Wells then argued that after the 2008 Agreement expired, the Barones, "who through their ownership interest in [Marina] knew that [Marina] had acknowledged Wells' ownership in and to its trademarks and explicitly agreed not to adopt or use any confusingly similar marks or logos," used Olympic "to offer an infringing product on the market." *Id.* at 9. Wells concluded that Olympic "should not be able to hide behind corporate structure to avoid personal jurisdiction." *Id.* Wells made similar arguments as to the relationship between Olympic, Marina and the Barones to argue that personal jurisdiction over Olympic is also supported by the *Calder*[2] "effects" test. *Id.* at 10-11.

Judge O'Brien agreed. He found that Olympic, "prior to adopting its trademark, had, through its agents, detailed knowledge of Plaintiff's proprietary interest in FROZFRUIT" and that Olympic's "adoption of a trademark similar to [Wells'] clearly constituted an act purposefully directed at this forum." Doc. No. 16 at 13. He concluded as follows:

> In summation, because Defendant had detailed knowledge of Plaintiff's proprietary interest in FROZFRUIT, as well as Plaintiff's status as an Iowa corporation headquartered in Iowa, their conduct was purposefully directed at and intentionally calculated to cause injury to Plaintiff within this district. As such, Defendant had adequate notice that its conduct would make it susceptible to being haled into court in the State of Iowa. Furthermore, because Plaintiff's interest in obtaining a convenient forum and this Court's interest in adjudicating causes of actions against residents of this jurisdiction overrides the Defendant's interest in convenience, the

---

[2] *Calder v. Jones,* 465 U.S. 783 (1984).

exercise of jurisdiction complies with traditional notions of fair play and substantial justice.

*Id.* at 14-15.

### E. *Arbitration*

The 2005 Agreement and the 2008 Agreement between Wells and Marina both contain agreements to arbitrate disputes. The relevant language is as follows:

> [A]ny claim, dispute or controversy (whether based in contract, tort, intentional or otherwise; constitution; statute; common law; or initial claims, counter-claims, cross-claims and third party claims, arising from or relating to this Agreement of [sic] the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause, any part thereof or the entire agreement ("Claim") shall be resolved upon the election of either party by binding arbitration pursuant to this arbitration provision. Notwithstanding this provision or any other herein, either party may apply to a Court of competent jurisdiction for emergency injunctive relief, as such relief cannot be readily provided by an arbitrator.

Doc. No. 30-3 at 2, 16. Both agreements set forth various procedures for selecting the arbitrator and conducting the proceedings. The 2005 Agreement specified Kansas City, Missouri, as the location for arbitration while the 2008 Agreement specified Chicago, Illinois.

On September 5, 2012, Marina and Olympic commenced an arbitration action with the American Arbitration Association ("AAA"). Count I of their statement of claim seeks a declaration that the FROZEN FRUIT product does not infringe Wells' "FROZFRUIT" mark. Count II seeks a declaration of unenforceability and non-infringement of the FROZFRUIT trade dress. Count III sets forth a breach of contract claim by Marina only, with Marina seeking damages from Wells for an alleged breach of the 2008 Agreement. Doc. No. 30-2.

6

## ANALYSIS

### I. *Olympic's Motion to Stay this Case in Favor of Arbitration*

Olympic, the only defendant in this case, has never been party to any agreement with Wells. Indeed, Wells and Olympic are competitors as they both make and/or sell similar frozen fruit bar products. Nonetheless, Olympic contends that Wells is compelled, by virtue of the prior written agreements between Wells and Marina, to arbitrate Wells' claims against Olympic.

In support of this proposition, Olympic relies on (a) the "liberal federal policy favoring arbitration agreements" and (b) the Eighth Circuit's opinion in *CD Partners, LLC v. Grizzle*, 424 F.3d 795 (8th Cir. 2005), in which a nonsignatory was allowed to invoke and enforce an arbitration agreement.

#### A. *Federal Policy*

The Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.*, declares a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24 (1983). A dispute must be submitted to arbitration if (a) there is a valid agreement to arbitrate and (b) the dispute falls within the scope of that agreement. *Telectronics Pacing Systems, Inc. v. Guidant Corp.*, 143 F.3d 428, 433 (8th Cir. 1998); *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (the FAA mandates that courts direct parties to arbitration on issues to which a valid arbitration agreement has been signed). The FAA establishes that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 25; *see also Barker v. Golf U.S.A., Inc.*, 154 F.3d 788, 793 (8th Cir. 1998), *cert. denied*, 525 U.S. 1068 (1999).

Generally, "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)). At the same time, however, a party who has not agreed to arbitrate a dispute cannot be forced to do so. *AT&T Tech.*, 475 U.S. at 648. Thus, while a party will be forced to abide by its agreement to arbitrate a dispute, that party will not be forced to arbitrate a dispute if it did not agree to do so.

### B.  *CD Partners*

In *CD Partners,* the plaintiff was party to four franchise agreements that included arbitration clauses. The other party to the agreements, a corporation, filed for bankruptcy protection. Plaintiff then filed suit against three individual officers of the corporation and alleged that those individuals were liable to plaintiff on theories of negligence, negligent misrepresentation and fraud arising from the operation of the franchises. 424 F.3d at 797-98. The defendants, while not parties to the agreements, alleged that they were nonetheless entitled to enforce the arbitration clause and compel arbitration of all claims. The Eighth Circuit agreed. The court noted that "[t]he test for determining whether a nonsignatory can force a signatory into arbitration is different from the test for determining whether a signatory can force a nonsignatory into arbitration." *Id.* at 799. Basically, it is (and should be) more difficult to compel arbitration with a party who never signed an agreement to arbitrate than to compel arbitration with a party who did. In the latter situation, arbitration can be compelled if the circumstances are such that the signatory should be estopped, under a theory known as alternative estoppel, from avoiding its agreement to arbitrate. *Id.*

The Eighth Circuit recognized two situations in which alternative estoppel may arise:

> One is when "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (quoting *Boyd v. Homes of Legend, Inc.*, 981 F. Supp. 1423, 1432 (M.D.Ala.1997)). Another is "when the signatory to a written agreement containing an arbitration clause 'must rely on the terms of the written agreement in asserting [its] claims' against the nonsignatory." *Id.* (quoting *Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc.*, 10 F.3d 753, 757 (11th Cir.1993)). "When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate." *Id.* (internal quotations omitted).

*Id.* at 798. The court found both situations were present in *CD Partners*:

> The relationship between signatory CDWI and the nonsignatory appellants is a close one. The tort allegations against the three appellants all arise out of their conduct while acting as officers of CDWI. Evisceration of the underlying arbitration agreement will be avoided only by allowing the three principals to invoke arbitration. Similarly, C.D. Partners's claims against the three appellants rely upon, refer to, and presume the existence of the written agreement between the two corporations. Thus, arbitration is appropriate.

*Id.* at 799. To justify a stay of this case, Olympic must show that one or both of these situations is present here.

### i. *Does The Relationship Between Olympic And Marina Require Arbitration To Avoid Evisceration Of The Arbitration Agreement?*

No. In *CD Partners,* the individual defendants were officers of the bankrupt signatory and were sued, basically as substitute defendants, because of their direct

9

involvement in the creation and administration of the four franchise agreements at issue. Indeed, the plaintiff initially sued the corporate defendant and was compelled to arbitrate, but the arbitration did not occur due to the corporation's intervening bankruptcy. 424 F.3d at 797. A second action, this time against the officers, then followed. *Id.* All of the claims in both cases related directly to the business relationship created and governed by the franchise agreements. *Id.* at 797-98. Under these circumstances, allowing the plaintiff to prosecute its claims without regard to its arbitration agreement would have eviscerated that agreement.

The present situation is far different. Olympic is not being sued as a proxy or substitute defendant based on conduct that occurred while Wells and Marina had a contractual relationship. Instead, and as its counsel acknowledged during the hearing, Olympic is being sued for actions it took after the last agreement between Wells and Marina expired. In particular, once Marina lost its Wells distributorship, it turned to Olympic to manufacture a fruit bar to replace the Wells FROZFRUIT bar. Olympic did so, utilizing the name and trade dress about which Wells now complains. These events happened after the 2008 Agreement expired.

Wells' claims against Olympic arise from Olympic's own actions subsequent to, and independent of, any business relationship between Wells and Marina. If Wells sought to hold Olympic liable for events that occurred during the Wells-Marina relationship, on a theory that Olympic caused or is responsible for acts or omissions by Marina while Marina was a Wells distributor, this case would be somewhat analogous to *CD Partners*. Under those circumstances, it would not be surprising or unfair to require that Wells arbitrate its claim. But that is not the nature of this case. Wells and Olympic are competitors. Wells contends that Olympic is selling a product that infringes Wells' established trademark and trade dress rights. Allowing Wells to litigate, rather than

arbitrate, these claims does not eviscerate the arbitration agreement between Wells and Marina.

### ii. *Must Wells Rely On The Terms Of Its Agreements With Marina?*

No. Wells has asserted claims for trademark infringement, false designation of origin and unfair competition. All of its claims turn on the issue of whether the name or packaging Olympic is utilizing for its frozen fruit bar infringes on Wells' "FROZFRUIT" mark or trade dress. Wells will not need to rely on any prior agreements with Marina, or anyone else, to establish the elements of these claims.

Olympic points out that Wells elected to reference the 2005 Agreement and 2008 Agreement in its complaint. Doc. No. 28-1 at brief pages 11-12. Olympic also notes that those agreements include provisions prohibiting Marina's use of Wells' intellectual property after the agreements terminate. *Id*. at 12-13. However, Olympic undertakes no analysis of the elements of Wells' actual claims in this case in an effort to show that Wells would be unable to prevail without relying on the terms of the agreements between Wells and Marina.

The elements of federal trademark infringement are (1) proof of a protected interest in a trademark and (2) likelihood of confusion as to the identity or association between the plaintiff and defendant due to the common use of the trademark. *See, e.g., Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (citing *Insty\*Bit, Inc. v. Poly–Tech Indus.*, 95 F.3d 663, 667 (8th Cir. 1996), *cert. denied*, 519 U.S. 1151 (1997). Wells is suing Olympic, a competitor, on a theory that Olympic is infringing on Wells' registered "FROZFRUIT" mark by selling a frozen fruit bar under the name "FROZEN FRUIT." Whether Wells can establish the elements of this claim remains to be seen. However, it is clear that Wells need not rely on the terms of any prior

agreements between Wells and Marina to prove its claims. Olympic does not argue otherwise.

With regard to false designation of origin, or trade dress infringement, there are three elements that apply under both the Lanham Act and Iowa common law:

> First, a party bringing an action must demonstrate that the allegedly infringing feature is non-functional. . . . Second, the aggrieved producer must show that its trade dress is distinctive. . . . Third, a party bringing a trade dress infringement action under either the Lanham Act or Iowa common law must demonstrate the alleged infringement creates a likelihood of confusion in the minds of consumers.

*Marshalltown Trowel Co. v. Walton Tool Co.*, No. 4-98-90565, 2000 WL 33361990, at *2 (S.D. Iowa Dec. 15, 2000) [citations omitted]; *see also Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000). Again, Olympic makes no argument to the contrary.

While Wells does make numerous reference in its complaint to the agreements with Marina, it is clear that the primary purpose of those references it is to establish personal jurisdiction over Olympic. For example, in the "Venue and Jurisdiction" section, Wells alleges that the "owners of [Olympic] have entered into four agreements with Wells, an Iowa company, three of which relate directly to the trademark and trade dress at issue in this judicial district." Doc. No. 2 at ¶ 6. Wells then proceeds to outline the history of contractual relationships it has had with the Barones, through Marina. *Id*. at ¶¶ 8-21. As demonstrated by its resistance to Olympic's motion to dismiss for lack of jurisdiction, the relevance of these allegations is to support Wells' claim that the Barones, as officers of Olympic, caused Olympic to engage in intentional conduct with knowledge that such conduct would cause harm to Wells in Iowa. Doc. No. 9 at brief pages 8-11.

Olympic cites no authority for the proposition that a party's reliance on past agreements and business relationships to support the exercise of personal jurisdiction over a nonsignatory has the same "alternative estoppel" effect as reliance on those agreements

to support substantive causes of action. *CD Partners,* the primary authority on which Olympic relies, did not address this situation. Instead, the Eighth Circuit stated that the alternative estoppel can arise "[w]hen each of a signatory's <u>claims</u> against a nonsignatory makes reference to or presumes the existence of the written agreement." 424 F.3d at 798 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)) [emphasis added]. As already discussed above, Wells' actual claims in this case are independent of any prior agreements. The fact that Wells has relied on the prior agreements and relationships to support this court's exercise of personal jurisdiction does not satisfy the second alternative estoppel theory recognized in *CD Partners*.

Finally, Olympic argues that Wells relies on the Marina agreements for purposes of establishing willful trademark infringement. Doc. No. 28-1 at brief page 14. Wells does, in fact, allege willful infringement and seeks treble damages pursuant to 15 U.S.C. § 1117. Doc. No. 2 at ¶ 32 and Prayer for Relief ¶ G. As with its personal jurisdiction argument, however, Wells relies on prior agreements and relationships to demonstrate that the Barones, as Olympic's principals, knew of Wells' rights. Wells does not, and need not, rely on the <u>terms</u> of the prior agreements to support the elements of any claims.

*CD Partners* was an action to enforce, and sue for breach of, written contracts containing arbitration clauses. Because the other signatory was in bankruptcy, the plaintiff had to sue individual officers and assert its theories as tort claims rather than contract claims. Under those circumstances, with the lawsuit being little more than a disguised contract claim, it was entirely appropriate to require that the plaintiff abide by the arbitration clauses contained in those contracts. This case is far different. Wells seeks relief based on a competitor's alleged infringement of trademark and trade dress rights. Wells does not, and need not, rely on the terms of any prior agreements with other parties to prosecute its claims. As such, the fact that those prior agreements contained

13

arbitration provisions does not compel Wells to arbitrate the claims it asserts against Olympic in this case.

This case is materially distinguishable from *CD Partners* with regard to both theories of alternative estoppel that the Eighth Circuit recognized. Under the *CD Partners* analysis, Olympic is not entitled to stay this action and compel Wells to arbitrate the claims contained in the complaint.

### C. Post-CD Partners Authorities

Four years after *CD Partners*, the Supreme Court decided *Arthur Andersen LLC v. Carlisle,* 129 S. Ct. 1896 (2009) and held, *inter alia*, that state law governs the question of whether a nonsignatory can enforce an agreement to arbitrate. 556 U.S. ___, 129 S. Ct. at 1902-03 ("a litigant who was not a party to the relevant arbitration agreement may invoke § 3 [of the FAA] if the relevant state contract law allows him to enforce the agreement."). The Eighth Circuit applied *Arthur Andersen* in *Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726 (8th Cir. 2009), recognizing that "state contract law governs the ability of nonsignatories to enforce arbitration provisions." *Id*. at 732. Applying Mississippi law, the court held that the nonsignatory was not entitled to compel arbitration because, *inter alia*, the signatory did not rely on the terms of the agreement in asserting its claims against the nonsignatory. *Id.* at 733-35.

In its brief in support of a stay in favor of arbitration, Olympic cited *Arthur Andersen* in arguing that federal law strongly favors arbitration. Doc. No. 28-1 at brief page 8. Strangely, however, Olympic did not mention *Arthur Andersen* (or *Donaldson*) in its argument concerning a nonsignatory's power to compel arbitration. While the 2005 Agreement and 2008 Agreement both contain Iowa choice-of-law clauses,[3] Olympic has

---

[3] Doc. No. 30-3 at 2, 17.

made no effort to argue that Iowa contract law allows it to enjoy the benefit of an arbitration agreement to which it was not a party.

The Iowa Supreme Court has held that a nonsignatory may be bound by an arbitration agreement under general principles of agency law. *Bullis v. Bear, Stearns & Co.*, 553 N.W.2d 599, 602 (Iowa 1996). It does not appear, however, that the Court has addressed the present situation, wherein a nonsignatory seeks to enforce an agreement to arbitrate. Where the state law is uncertain, the federal court must predict how the state supreme court would resolve the issue if faced with it. *See, e.g., Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1301 (8th Cir. 1993). Neither party has argued that the Iowa Supreme Court would analyze the issue in a manner that materially differs from the Eighth Circuit's "alternative estoppel" analysis in *CD Partners*. The court predicts that the Iowa Supreme Court would adopt a similar analysis if presented with this issue. As such, and for the reasons set forth in subpart I(B), *supra*, the court finds that under Iowa law, Olympic is not entitled to enforce the arbitration clauses contained in the agreements between Wells and Marina.

### D. *Conclusion*

Olympic, as a nonsignatory to the agreements at issue, has not established that Wells is bound by alternative estoppel to honor the arbitration provisions contained in those agreements. Olympic is not entitled to a stay of this action in favor of arbitration.

## II. Wells' Motion to Stay Arbitration

As noted above, Olympic and Marina commenced their arbitration action against Wells nearly nine months after Wells filed this case. Doc. No. 30-2. Count I of their statement of claim seeks a declaration that the FROZEN FRUIT product does not infringe Wells' "FROZFRUIT" mark. Count II seeks a declaration of unenforceability

and non-infringement of the FROZFRUIT trade dress. Count III is a breach of contract claim by Marina only, with Marina seeking damages from Wells for an alleged breach of the 2008 Agreement. *Id.*

Wells does not contest the arbitrability of Marina's breach of contract claim but does contend that the two non-infringement claims do not arise out of, and are not related to, the distribution agreements that contain arbitration clauses. Wells emphasizes that because Olympic is the alleged infringer, and the distribution agreements were between Wells and Marina, the non-infringement claims are entirely separate from the distribution agreements containing the arbitration clauses. As such, Wells contends that those claims are not subject to arbitration.

Olympic responds that the arbitration clauses are broad enough to encompass the non-infringement claims because they state "any claim, dispute, or controversy . . . arising from or relating to [the] Agreement, of [sic] the relationships which result from [the] Agreement" are subject to arbitration. Olympic asserts that it can submit these claims to arbitration as a non-signatory based on the theory that Olympic is essentially inseparable from its principals and their company, Marina, as the court found in denying Olympic's motion to dismiss for lack of personal jurisdiction.

A threshold issue is whether a federal court has the power to stay or enjoin a pending arbitration proceeding, particularly when one party to that proceeding is not a party to the federal lawsuit. Despite moving for such relief, Wells failed to cite any authorities (in its brief or during argument) for the proposition that the court has such power. After its own search, the court has determined that such authority is far from clear. Courts considering the issue have enunciated four different rationales under which such a stay may be appropriate.

The first is a broad interpretation of the Federal Arbitration Act (FAA). Section 3 authorizes a district court to stay litigation which relates to a claim of arbitration. 9

U.S.C. § 3. Section 4 of the FAA allows parties to petition a district court for an order to compel arbitration. Some courts have relied on Section 4 as implicitly providing authority for a stay of arbitration proceedings under "appropriate circumstances." *See Westmoreland Capital Corp. v. Findlay*, 100 F.3d 263, 266 n.3 (2d Cir. 1996) ("While § 3 of the FAA gives federal courts the power to stay *trials* pending *arbitration*, we note that a number of courts have held that, in appropriate circumstances, § 4 of the FAA may be applied to stay or enjoin arbitration proceedings."); *see also Tai Ping Ins. Co., Ltd. v. M/V Warschau*, 731 F.2d 1141, 1144-46 (5th Cir. 1984) (suggesting that an "appropriate circumstance" for a stay may be found if the dispute is not covered by the arbitration agreement.)

Other courts have stayed arbitration proceedings in reliance on the court's inherent power. *See Landis v. North American Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."); *see also Rogers v. Ameriprise Financial Servs., Inc.*, No. 07 C 6876, 2008 WL 4826262, at *2 (N.D. Ill. Nov. 4, 2008) (noting that the decision to issue a stay rests within the court's discretion which must be exercised in a manner that is consistent with equity and judicial economy).

State law provides another source of potential authority to stay arbitration proceedings. *See Security Ins. Co. of Hartford v. TIG Ins. Co.*, 360 F.3d 322, 324 (2d Cir. 2004) (affirming district court's stay of arbitration based on California law which permits a court to stay a pending arbitration where one of the parties is also a party to a pending court action arising out of the same transaction and there is a possibility of conflicting rules).

Finally, requests to stay arbitration proceedings are sometimes presented to the court as motions for preliminary injunction. *See ON Equity Sales Co. v. Pals*, 509 F.

Supp. 2d 761, 766 (N.D. Iowa 2007). When presented in this manner, courts use the traditional multi-factor test for injunctive relief. *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (one such factor being that a movant may be irreparably harmed by being forced to expend time and resources arbitrating an issue that is not arbitrable).

Regardless of the framework used to review a motion to stay an arbitration proceeding, the court has wide discretion in making this decision. Using this discretion, the court finds that it would be inappropriate to stay the arbitration proceeding under the circumstances here. Wells maintains that the non-infringement claims are not subject to arbitration because they do not arise from or relate to the distribution agreements and they involve Olympic, who was not a party to the distribution agreements. Because the issue is one of arbitrability, the question becomes whether the court or the arbitrator should decide what is arbitrable.

"Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995) (internal citations omitted). Issues of arbitrability are to be decided by the arbitrator in the first instance if the agreement to arbitrate "clearly and unmistakably" so provides. *AT&T Tech.*, 475 U.S. at 649. An arbitration provision that incorporates the Rules of the American Arbitration Association ("AAA Rules") or other rules giving arbitrators the authority to determine their own jurisdiction "is a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court." *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009). In *Fallo*, the arbitration clause stated that disputes "shall be settled by arbitration in accordance with the Commercial Rules of the American Arbitration Association." *Id*. The court found this was a

clear and unmistakable expression of the parties' intent to leave arbitrability to the arbitrator because it incorporated Rule 7(a) of the AAA Rules which gives the arbitrator "the power to rule on his or her own jurisdiction." *Id.*

The agreements between Wells and Marina contain a similar reference to the AAA Rules. The parties agreed that "[i]f settlement negotiations do not resolve the dispute within thirty (30) days from the date of the written request for negotiations, then either party may submit the dispute to binding arbitration in accordance with the Commercial Rules of the American Arbitration Association." Doc. No. 30-3 at 15-16. Those rules include Rule 7(a), which gives the arbitrator the power to rule on his or her own jurisdiction. Given this clear intent, along with the breadth of the clause "any claim, dispute, or controversy . . . arising from or relating to [the] Agreement, of [sic] the relationships which result from [the] Agreement," the court finds that the question of arbitrability of the non-infringement claims is best left to the arbitrator.

The court is also reluctant to stay arbitration when the arbitration and the civil action do not involve identical parties and identical issues. "[A]n arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 20. Although Olympic is a party in the civil case and not a signatory to the arbitration agreement, it filed the Arbitration Statement along with Marina, who is a signatory to the arbitration agreement and has a right to enforce the agreement against Wells. While Marina and Olympic's arbitration filing contains some of the same issues being litigated in this court, they also bring a claim for breach of contract. The court has no jurisdiction over Marina as a non-party, nor is Marina's breach of contract claim before this court. This provides an additional reason for the court to decline Wells' request for a stay of the arbitration proceeding.

Wells is free to ask the arbitrator, in accordance with the AAA Rules, to determine if any claims, or parties, currently present in the arbitration matter are beyond the scope of the arbitration agreements between Wells and Marina. The arbitrator may wish to take into consideration the fact that this court has denied Olympic's request for a stay and will permit Wells' to prosecute its infringement claims against Olympic in this action. In any event, however, this court finds that it is not appropriate to interfere with the arbitration proceedings.

## *CONCLUSION*

Based on the foregoing:

1. Olympic's motion to stay this litigation in favor of arbitration (Doc. No. 28) is **denied**.

2. Wells' motion for order staying the arbitration proceeding filed by Olympic and Marina (Doc. No. 30) is **denied**.

**IT IS SO ORDERED.**

**DATED** this 22nd day of October, 2012.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA